UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

01 JUN 18 PM 4:09

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| SHIRLEY ALEXANDER and JO ANN GRAYSON, | ) ) ) | |
| Plaintiffs, | ) ) | CV 00-BU-2877-S |
| v. | ) ) | |
| VESTA INSURANCE GROUP, INC. and J. GORDON GAINES, INC., | ) ) ) ) | **ENTERED** JUN 1 8 2001 |
| Defendants. | ) ) | |

## Memorandum Opinion

In their complaint in the above-styled action, Plaintiffs Shirley Alexander and Jo Ann Grayson assert claims against their former employer, Defendants Vesta Insurance Group, Inc. ("Vesta") and J. Gordon Gaines, Inc. ("JGGI"), alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); 42 U.S.C. § 1981 ("Section 1981"); the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"); the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. ("FLSA"); and Alabama fraud law. Now before the Court is a motion for summary judgment filed by Defendants on May 1, 2001, seeking the dismissal of Plaintiffs' race discrimination claims and their fraud claims, and Defendants further contend that they are entitled to an order

27

limiting the maximum amount of overtime compensation that Plaintiffs might recover at trial on their FLSA claims. (Doc. 20). The parties have filed evidence and briefs in support of their respective positions on the motion, which is now ripe for decision. Upon consideration of the record and the arguments of counsel, the Court concludes that Defendants' motion for summary judgment is due to be GRANTED IN PART AND DENIED IN PART. It is due to be granted to the extent that it seeks the dismissal of Plaintiffs' race discrimination claims brought under Title VII and Section 1981 and their fraud claims. In addition, although Defendants have not moved for summary judgment on Plaintiffs' ADEA claims, the Court has determined <u>sua sponte</u> that the evidence demonstrates that there is no genuine issue of material fact and that Defendants are entitled to judgment as a matter of law on those claims as well. However, Plaintiffs will be afforded an opportunity to present evidence and argument in support of their ADEA claims prior to the Court's final decision on their dismissal. Defendants' motion is due to be denied to the extent it seeks an order placing a cap on the amount Plaintiffs might recover on their FLSA claims.

## I. BACKGROUND[1]

---

[1]"The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record. These are the 'facts' for summary judgment purposes only. They may not be the actual facts. <u>See Cox v. Administrator U.S. Steel & Carnegie</u>, 17 F.3d 1386, 1400 (11th Cir. 1994)." <u>Underwood v. Life Ins. Co. of Georgia</u>, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998). The Court would also note that Plaintiffs' Brief in Opposition to the Motion for Summary Judgment (hereinafter "Plaintiffs' Brief") does not comply with Appendix A, governing the format of briefs submitted in connection with pretrial dispositive motions, as required by this Court's Rule 16(b) Order of

Plaintiffs Grayson and Alexander are African American, and they were both born in 1950. They were also both originally hired by Liberty National Insurance Company to work in its commercial lines department in Birmingham, Alabama. Alexander was hired in 1991 as an underwriter assistant, with duties that included rating, coding, and processing policy cancellations and non-renewals. Grayson also performed rating and coding work in the commercial lines department upon being hired by Liberty National in 1992, and in about 1995 she was also given the title of underwriter assistant. In 1993, both Plaintiffs became employees of Defendant Vesta, which was created in a spinoff from Liberty National's parent company, Torchmark Insurance. Plaintiffs' job duties, however, did not change in any substantial way when they became Vesta employees. Defendant JGGI is the services administration company for Vesta. It is undisputed that Vesta's employees are also considered employees of JGGI for purposes of their paychecks and benefits.

In July 1997, Vesta purchased Shelby Insurance Companies ("Shelby"), located in Shelby, Ohio, and Greensboro, North Carolina. Soon thereafter, Alexander began working on the Shelby commercial lines. The work on the

---

November 20, 2000 (Doc. 6) at 3. In particular, Plaintiffs have failed to provide specific responses to the factual allegations set forth in Defendants' statement of facts. See Appendix A at Part II(B)(4)(b)(i) ("The Non-moving Party's Response to the Moving Party's Initial Statement of Facts shall be clearly designated as such and shall contain specific numbered responses corresponding to each footnoted fact statement in the Moving Party's Initial statement of Facts"). Because of this failure, the Court will deem "admitted" for summary judgment purposes all factual allegations made by Defendants in the initial statement of facts except insofar as the Court finds that such allegations are contradicted by properly supported factual assertions made by Plaintiffs in their statement of facts.

Shelby lines differed significantly from the Vesta commercial line work, as the former was more automated and used different computer systems. As a result, Alexander was sent to Ohio where she received training on the Shelby systems, although she continued to work in Birmingham. Also in 1997, Grayson was assigned to work as an underwriter assistant servicing Vesta's commercial customers located in Texas, which involved a rating and coding system that was different from the systems Vesta used in connection with its business in other states.

Until 1999, the combined Vesta and Shelby companies offered two different lines of insurance–personal lines and commercial lines. As the name suggests, commercial lines, with which Plaintiffs worked, dealt with insurance for various types of commercial customers. In about March 1999, after Vesta's industry rating was downgraded, it was announced that all of the Vesta and Shelby commercial lines, with the exception of its small business owner policies ("BOP"), would be discontinued. Vesta advised the commercial lines underwriters in Birmingham that several of them would lose their jobs later that month while other underwriters and underwriter assistants, including Plaintiffs, and clerical workers in commercial lines would be moved to work on the BOP lines.

At a meeting in about late May or early June 1999, however, Vesta announced that even its BOP lines would be eliminated and that the entire commercial lines department where Plaintiffs worked would be phased out. At that time, all of the remaining commercial lines underwriters in Birmingham were laid off, except one African-American woman, Adrienne Jones, who was transferred to an underwriting position in Vesta's personal lines department in about June 1999. All of the employees working on commercial lines in Shelby, Ohio, were also told

they would be laid off. Vesta officials told Plaintiffs and the other underwriter assistants and clerical employees who had been working on the BOP lines in Birmingham, however, that they would eventually all be moved to other positions within the company, based upon the fact that some personal lines work from the company's Ohio offices was going to be relocated to Birmingham and upon expectations that Vesta's personal lines business would expand.

In fact, Vesta provided to the Plaintiffs and the other remaining BOP staff members a document entitled, "C.L. Moves,"[2] which set forth a schedule for each employee's planned transfer to the personal lines department. It states that fifteen employees, of which seven were white and eight were black, would be moved to personal lines almost immediately, as of June 7, 1999.[3] Of these fifteen, it appears that five were underwriter assistants, four of whom were white.[4] Fifteen other employees, also seven white and eight black, were listed under the section entitled, "Later Moves to P.L.," meaning the personal lines department. Of these fifteen, eleven, including both Plaintiffs, appear to have been underwriter assistants, five of whom were white.[5] All of these employees were to remain in commercial lines

---

[2]"C.L." stands for commercial lines.

[3]This list of employees who were to move to personal lines on June 7, 1999, includes Adrienne Jones, the black female commercial lines underwriter who was transferred to an underwriter position in personal lines.

[4]The record indicates that the employees to be moved in June 1999 who were also underwriter assistants were: Debbie Corbin, Chris Giadrosich, Lori Martens, Adrienne Ellis, and Sherry Davis.

[5]The employees listed under "Later Moves to P.L." who appear to have been underwriter assistants were: Plaintiff Shirley Alexander, Plaintiff Jo Ann

department to work on the "runoff team," i.e., they would service and administer outstanding Vesta and Shelby commercial lines policies until their eventual lapse. According to this schedule, five "runoff" employees would be transferred to personal lines in December 1999; Plaintiffs and three other employees would be transferred in June 2000; and the last five employees would be transferred in August 2000.

It is undisputed, though, that this initial schedule ultimately was not followed, even with respect to the first round of planned transfers, as several employees resigned after the announcements were made.  While underwriter assistant positions did not exist in Vesta's personal lines department, in June 1999 Vesta provided training to five underwriter assistants in commercial lines in preparation for moving them into underwriter positions in personal lines. Each of these five employees was white.[6]  The one black underwriter assistant in commercial lines who was originally scheduled to be transferred to personal lines in June 1999, Adrienne Ellis, apparently resigned before any move was actually made.  However, two of the white underwriter assistants who did receive the training and were transferred, Michelle Standige and Dianna Oaks, were not originally scheduled to be moved to personal lines until December 1999 and August 2000, respectively.  After these five white employees finished their training, they were transferred into underwriter positions in personal lines by September 1999.

───────────────

Grayson, Yvonne Jones, Millie Kelly, Michelle Karr, Bernice McCants, Dianna Oaks, Michelle Standige, Liz Lilly, Connie George, and Carla Hicks.

[6]Plaintiffs claim that these five white underwriter assistants were: Michelle Standige, Lori Martens, Chris Giadrosich, Dianna Oaks, and Carrie Davis.

This, according to Plaintiffs, left eight commercial lines underwriter assistants, including themselves, who were assigned to the runoff team.[7]   Five of these employees were black, and three were white, including one, Debbie Corbin, who was originally on the list to be moved to personal lines in June 1999.[8]

After the underwriter assistants who had been working in commercial lines were initially assigned to the training classes or to the runoff team in June 1999, as described above, there were several other personnel moves made between that time and May 2000.  At some point within that time frame, Vesta moved two of the underwriter assistants working in runoff to other positions within the company. However, neither employee, Debbie Corbin nor Bernice McCants, was given an underwriter position.  Corbin, who is white, was trained for and moved to a "testing" position in personal lines, which Alexander claims was "created" for Corbin.  McCants, who is African-American, was assigned to Vesta's accounting department.  At another point, one of the white underwriter assistants working in runoff, Millie Kelly, resigned.  Meanwhile, in January 2000, Carrie Davis, one of

---

[7]Plaintiffs claim that the five black underwriter assistants moved to the runoff team in June 1999 were:  Plaintiffs Shirley Alexander and Jo Ann Grayson, Yvonne "Lenora" Jones,  Bernice McCants, and Liz Lilly, while the three white underwriter assistants similarly moved were: Millie Kelly, Michelle Karr, and Debbie Corbin.

[8]While the "C.L Moves" list contains sixteen employees who worked as underwriter assistants in commercial lines, Plaintiffs contend that only thirteen underwriter assistants were actually either trained for underwriter positions in personal lines or assigned to the runoff team.  The difference appears to result from employee resignations occurring after Vesta announced that the commercial lines department would be phased out.

the white underwriter assistants who had transferred to an underwriter position in personal lines in June 1999 resigned from her position. None of the assistant underwriters working in runoff were offered the position. Instead, Plaintiffs assert, Davis was replaced by an unidentified white woman who was not working in commercial lines and who had been employed by Vesta for only a short time.

Vesta also ran advertisements in the April 23 and April 30, 2000 editions of the Birmingham News seeking applicants for four positions: (1) claims supervisor, (2) claims examiner, (3) casualty adjuster, and (4) inside property adjuster. Neither Plaintiff was ever told about these openings by anyone at Vesta, nor were Plaintiffs offered any training for the positions. Alexander, however, noticed one of these newspaper advertisements, although she does not assert that she applied for any of the positions it concerned. Vesta admits that, between April 24 and June 15, 2000 and in connection with these ads, it hired eight individuals for the referenced positions, three of whom were not African-American.

On May 10, 2000, Plaintiffs' manager, Russ Crouch, advised Plaintiffs that they were going to be terminated, along with all the other underwriter assistants who were still employed on the runoff team at that time, because their department was being closed and that Vesta had no available positions they could fill. Grayson was laid off on May 20, 2000, while Alexander was laid off on August 25, 2000. Four of the underwriter assistants who were laid off were African-American while only one was white. On or about July 14, 2000, Grayson filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that Vesta had discriminated against her on the basis of race and age by failing to transfer her to an underwriter position in the personal lines department in June 1999 and by laying

her off without offering her a transfer or another position. Alexander filed a substantially similar charge with the EEOC on October 25, 2000.

After being terminated, Plaintiffs allegedly learned for the first time that they had not been exempt from the overtime requirements of the FLSA. Plaintiffs assert that throughout their employment, Vesta had represented to them that they were exempt employees and thus had no right to overtime pay. Vesta admits that prior to the Spring of 1998, it had improperly categorized Plaintiffs and other underwriter assistants working in the Birmingham office as exempt from the overtime requirements of the FLSA. At that time, however, Vesta reclassified Plaintiffs as non-exempt employees and began paying them for overtime they worked.

Plaintiffs filed their complaint in this action on October 11, 2000. Therein Plaintiffs assert that Defendants failed to pay them for overtime worked as required by the FLSA. Plaintiffs next claim that Defendants unlawfully discriminated against them on the basis of race, in violation of Title VII and Section 1981, and on the basis of age, in violation of the ADEA, by laying them off while transferring to other positions similarly situated employees who were white and younger. And finally, Plaintiffs state that Defendants are liable for fraud under Alabama law, based upon allegations that Defendants had misrepresented to Plaintiffs their status under the FLSA, "in order to induce them to work without overtime and not to take any action to correct the unlawful actions." On these fraud claims, Plaintiffs allege that they suffered damages in the form of lost wages and that they are entitled to recover other compensatory and punitive damages. Following the completion of discovery, Defendants filed the instant motion for summary judgment on May

1, 2001, seeking the dismissal of Plaintiffs' race discrimination claims and their fraud claims, and further requesting an Order limiting the maximum amount of overtime compensation that Plaintiffs might recover at trial under their FSLA claims.

## II. SUMMARY JUDGMENT STANDARDS

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Celotex, at 323. See also Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its to initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994). In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. Rooney v. Watson, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing

<u>Hale v. Tallapoosa Co.</u>, 50 F.3d 1579, 1581 (11th Cir. 1995)).  "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.' " <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 120 S.Ct. 2097, 2110 (2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p.299).

<u>III.  DISCUSSION</u>

**A.  The Race Discrimination Claims**

Plaintiffs claim in their complaint that Defendants have discriminated against them in their employment on the basis of race.  In particular, Plaintiffs have asserted that Defendants did so by failing to offer Plaintiffs the training and transfers to the underwriter positions in personal lines that were given to white employees in June 1999 and by laying the Plaintiffs off without offering them a transfer or another position. Defendants contend that they are entitled to summary judgment on each of these claims.

<u>1.  The Transfer Claims</u>

<u>a.  Timeliness of EEOC Charges</u>

Defendants first argue that Plaintiffs' claims alleging that the failure to train and transfer them to personal lines underwriter positions in June 1999 was racially motivated are untimely because Plaintiffs filed their EEOC charges complaining of such action too late.  Title VII generally requires a plaintiff, as an administrative prerequisite to bringing suit, to have filed a charge with the EEOC no more than 180 days after "the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1).  See <u>Stewart v. Booker T. Washington Ins.</u>, 232 F.3d 844, 848 (11th

Cir. 2000). Defendants point out that Plaintiffs deposition testimony reveals that they were aware, more than 180-days before they actually filed their EEOC charges, that all five of the underwriter assistants who were trained for and transferred to underwriter positions in personal lines as part of the announced reduction in force were white.[9]  Indeed, Plaintiffs conceded that such circumstances caused them to suspect at that time that Vesta's failure to train and transfer them as well might have been the result of racial discrimination. Defendants contend that such demonstrates that Plaintiffs' EEOC charge were untimely filed, precluding them from maintaining their race discrimination claims based on the June 1999 transfers. For two reasons the Court disagrees.

First, to the extent Plaintiffs transfer claims are brought under Title VII, "[t]he requirement that a claimant file 'a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to sue in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.' " Stafford v. Muscogee County Bd. of Educ., 688 F.2d 1383, 1387 (11th Cir. 1982) (quoting Zipes v. Transworld Airlines, Inc., 455 U.S. 385, 393 (1982)). Under equitable modification, a limitations period does not start to run until the facts which would support a charge of discrimination are apparent or should be apparent to a person with a reasonably prudent regard for his rights. Sturniolo v. Sheaffer, Eaton, Inc., 15 F.3d 1023, 1025 (11th Cir. 1994) (citing Reeb v. Economic

---

[9]The 180-day period prior to the filing of Plaintiff Grayson's EEOC charge on July 14, 2000, commenced on January 16, 2000. The 180-day period prior to the filing of Plaintiff Alexander's EEOC charge on October 25, 2000, commenced on April 29, 2000.

Opportunity Atlanta, Inc., 516 F.2d 924, 931 (5th Cir. 1975)[10]). While an employer is actively trying to find a position within the company for an employee, the 180-day filing period is equitably tolled until such time as it is or should be apparent to an employee with a reasonably prudent regard for his rights that the employer has ceased to actively pursue such a position. Cocke v. Merrill Lynch & Co., 817 F.2d 1559, 1561 (11th Cir. 1987).[11] Such is the case, the Eleventh Circuit has explained, because "[i]t is too much for the law to expect an employee to sue his employer for . . . discrimination at the same time he is led to believe that the employer is trying to place him in another job." Id. at 1561-62.

Plaintiffs acknowledge that they suspected at the time that Vesta's failure to train and transfer them to underwriter positions in personal lines may have been the result of race discrimination. However, they also each allege that they were then expressly assured by their supervisors not to worry about the failure to move them as well because Vesta would be transferring them to personal lines positions once their work on the runoff team was completed. Plaintiffs further assert that they were never told anything leading them to believe otherwise until May 10, 2000, which is within the 180-day period prior to each Plaintiff's EEOC charge,

---

[10]All decisions of the United States Court of Appeals for the Fifth Circuit handed down prior to the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[11]Cocke involved the ADEA rather than Title VII, but both statutes have a similar 180-day period for filing charges with the EEOC. See 29 U.S.C. § 626(d)(1); Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1434 n.11 (11th Cir. 1998); Hipp v. Liberty Nat. Life Ins. Co., — F.3d —, — n.10, 2001 WL 575489, *25 n.10 (11th Cir. 2001).

when they were notified that they were going to be terminated because there were not any positions available for them. The Court concludes that such allegations, viewed in the light most favorable to Plaintiffs, are sufficient to create at least a jury question on the issue of whether Plaintiffs EEOC charges were timely. Thus, summary judgment is not warranted on Plaintiffs' Title VII claims regarding the June 1999 transfers based upon this argued ground. See Cocke, supra (holding that although the plaintiff was suspicious that the reason he had not been relocated prior to receiving notice of termination was because of his age, the employer's assurances that it was still trying to transfer him to another position before the effective date of his termination permitted the inference that he may have been justified before resolving that suspicion into a fact he should act upon); England v. United Ins. Co. of America, 97 F.Supp. 2d 1090, 1093-94 (M.D. Ala. 2000) (denying summary judgment based on the timeliness of the plaintiffs' EEOC charges where the plaintiffs alleged that their former employer "strung [them] along" and made them believe that their reduction-in-force terminations were not yet final notwithstanding their termination letters).

The second reason that the Court must address the merits of Plaintiffs' race discrimination claims regarding the June 1999 transfers is that Plaintiffs have brought such claims not only pursuant to Title VII but also pursuant to Section 1981.[12] Following the passage of the Civil Rights Act of 1991, Title VII and section

---

[12]Plaintiffs assert claims of race and age discrimination in part "B" of the "Causes of Action" section of their complaint, under the heading, "Title VII and the ADEA." See Complaint at 5. While such might seem to suggest that Plaintiffs bring their race discrimination claims only under Title VII, in the "Jurisdiction" section of their complaint, Plaintiffs also expressly cite 42 U.S.C. §

1981 each prohibit an employer from taking adverse employment action against its employee on the basis of race and both statutes require the same proof to show liability. <u>Standard v. A.B.E.L. Services, Inc.</u>, 161 F.3d 1318, 1330 (11th Cir. 1998). However, Section 1981, unlike Title VII, does not require a plaintiff to pursue administrative remedies with the EEOC before bringing suit. See <u>Patterson v. McLean Credit Union</u>, 491 U.S. 164, 180-81 (1989); <u>Johnson v. Railway Exp. Agency, Inc.</u>, 421 U.S. 454, 460 (1975) ("[T]he filing of a Title VII charge and resort to Title VII's administrative machinery are not prerequisites for the institution of a s 1981 action"); <u>Caldwell v. National Brewing Co.</u>, 443 F.2d 1044, 1046 (5th Cir. 1971). Accordingly, to the extent that Plaintiffs have brought their race discrimination claims regarding the June 1999 transfers under Section 1981, Defendants' argument regarding the timeliness of Plaintiffs' EEOC charges lacks any force whatsoever.

       b. The Merits

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981 guarantees to all persons in the United States "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Following the passage of the Civil Rights Act of 1991, the term "make and enforce contracts" is broadly defined as including "the making,

---

1981. Complaint at 1. Given this citation, and because Title VII and Section 1981 now both prohibit race discrimination in employment and operate under the same substantive standards, as explained in text below, the Court concludes that Plaintiffs have asserted race discrimination claims under both statutes.

performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Because Title VII and Section 1981 have the same requirements of proof and use the same analytical framework, the Court shall address Plaintiffs' Title VII claims with the express understanding that the analysis applies to their Section 1981 claims as well. See Standard, 161 F.3d at 1330.

In this case, Plaintiffs attempt to prove their claims of race discrimination using circumstantial evidence.[13]  When circumstantial evidence is sought to be used to prove a Title VII discrimination claim, courts use the analytical framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981).  Under this framework, the plaintiff must first establish a prima facie case of discrimination, which creates a presumption of discrimination.  The employer must then produce sufficient evidence to indicate that it took the employment action for one or more legitimate, nondiscriminatory reasons.  If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are merely a pretext for unlawful discrimination. See McDonnell Douglas, 411 U.S. at 802-05; Burdine, 450 U.S. at 252-256.

As a threshold matter, the Court would note that it is undisputed that the personnel moves upon which Plaintiffs base their race discrimination claims were

---

[13]Plaintiff does not contend that he might offer direct evidence or statistical evidence of race discrimination, the other avenues by which he might have attempted to prove his Title VII discrimination claim.  See Standard, 161 F.3d at 1330.

occasioned by the reduction-in-force ("RIF") that resulted from Vesta's decision to eliminate its commercial lines department.[14]  Federal anti-discrimination laws do not mandate that employers establish an interdepartmental transfer program during the course of a RIF, require that employees outside of a protected classification be fired so that other employees within a protected group can be hired, or impose any added burden on employers to transfer or rehire laid-off workers in a protected group as a matter of course.  See Jameson v. Arrow Co., 75 F.3d 1528, 1532-33 (11th Cir. 1996).[15]  However, an employer implementing a RIF may not favor employees of one race over those of another when it does attempt to find new positions for its employees.  See Taylor v. Canteen Corp., 69 F.3d 773, 780 (7th Cir. 1995) (also discussing the requirements of the ADEA).  Thus, while Vesta initially had no obligation to transfer Plaintiffs or any other employees to other jobs when it was announced that their department would be eliminated, once Vesta undertook to move its commercial lines employees to other positions within the company, it was required to do so on a non-discriminatory basis.

Plaintiffs first challenge Vesta's failure to train and transfer them to

---

[14]Plaintiffs do not dispute Vesta's claim that its determination to close its personal lines department was based upon legitimate economic concerns.

[15]It seems that a good many of the reported appellate cases involving reductions- in-force, including Jameson, concern claims under the ADEA rather than Title VII  However, the "[t]he Eleventh Circuit has adapted to issues of age discrimination the principles of law applicable to cases arising under the very similar provisions of Title VII."  Combs v. Plantation Patterns, 106 F.3d 1519, 1530 n. 4 (11th Cir. 1997) (quoting Hairston, 9 F.3d at 919, citing Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989)).  The Court discerns no reason why a converse adaptation should not be applicable to the instant discussion.

underwriter positions in personal lines in June 1999.   To establish job discrimination in transfers and assignments, a Title VII plaintiff relying upon circumstantial evidence first must make a prima facie case of discrimination by showing that he or she was treated differently than were similarly situated employees of other races with respect to transfers and assignments.  See Alexander v. Fulton County, Ga., 207 F.3d 1303, 1344 (11th Cir. 2000).  The record indicates that all five of the underwriter assistants who were given training and advantageous transfers to underwriter positions in personal lines were white, while Plaintiffs and other African-Americans who also worked in commercial lines and held the same job title and had greater experience than the whites were denied such opportunities. The Court concludes that such evidence, if unrebutted, is clearly enough to permit an inference that the failure to train and transfer Plaintiffs was racially discriminatory.  Thus, it is sufficient to establish a prima facie case.

Accordingly, the burden shifts to Defendants to produce evidence sufficient to allow a factfinder to determine that Plaintiffs were treated differently from the five white employees offered training and transfers for one or more legitimate, non-discriminatory reasons. See Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997).   Defendants have satisfied that burden.   Russ Crouch, Plaintiffs' supervisor, stated at his deposition that when he and two other Vesta managers were determining which commercial lines employees would remain there to work on the runoff team, they "had to have somebody in each of the positions, the key positions in discontinued lines or runoff lines so . . . that the work could be serviced." In short, Crouch then proceeded to explain that Plaintiffs were assigned to the runoff team because they both occupied such "key" posts due to their greater

and/or unique experience and capabilities.  Crouch expressed that Alexander was placed on the runoff team because she was the underwriter assistant with the most knowledge, experience, and "cross-training" of any of the remaining underwriter assistants with respect to both the Shelby and Vesta commercial lines.  As she had worked on the "large accounts" serviced by Shelby but that she also had been employed on the Vesta side of the business for many years, she had the greatest versatility to handle such work if it came up or other runoff employees left. Crouch similarly related that Plaintiff Grayson was needed on the runoff team because, at the time the decision was made to discontinue the commercial lines, she was the only underwriter assistant that had experience working with the rating and coding system used in connection with the Vesta commercial lines sold in Texas, which were different from the systems used for all other states.

In order to survive summary judgment, Plaintiffs must now create a genuine issue of material fact as to whether the reasons advanced by Defendants are merely a pretext for race discrimination.  Bogle v. Orange County Bd. of County Com'rs, 162 F.3d 653, 658 (11th Cir. 1998).  In other words, Plaintiffs must provide sufficient evidence to allow a reasonable fact finder to conclude, at a minimum, that the proffered reasons were not actually the motivation for the failure to train and promote them.  See Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997), cert. denied, 118 S.Ct. 685 (1998).  Plaintiff may do this (1) by showing that the legitimate nondiscriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons.  Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996).  See also Reeves v. Sanderson Plumbing Products, Inc.,

530 U.S. 133, 148 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," but cautioning that such a showing may not always be adequate to sustain a finding of unlawful discrimination).

In support of their pretext argument, the Court discerns Plaintiffs to be citing evidence tending to show the following:

(1) that all five of the underwriter assistants afforded training and transfers to personal lines underwriter positions in June 1999 were white;

(2) that five of the eight underwriter assistants assigned to the runoff team were African-American;

(3) that each of the three Vesta supervisors who were the decisionmakers with respect to assignments to personal lines and runoff were white;

(4) that after one of the whites initially transferred to an underwriter position in personal lines resigned in January 2000, her position was not offered to Plaintiffs, and she was replaced by another white woman from another department who had only been employed a short time;

(5) that Vesta hired eight individuals, three of whom were not African-American, for claims positions after running newspaper advertisements in late April 2000 without offering the positions to Plaintiffs;

(6) that Plaintiffs received assurances from their supervisors that they would be transferred to other positions within the company when their runoff work was complete but they were laid off instead;

(7) that Vesta transferred one black and one white underwriter assistant working to non-underwriter positions;

(8) that one white underwriter assistant left Vesta to take a job outside the company; and

(9) that the five remaining underwriter assistants – four of whom were African-American and only one was white – were all laid off.

The Court concludes that the foregoing evidence falls short of being able to establish pretext. While the fact that the three decisionmakers in this case were white is not without relevance, it is extremely weak evidence at best given that Plaintiffs admit that they never heard of any of these individuals, or any other employees at Vesta for that matter, making remarks that could be construed as racially discriminatory. See Crim v. Board of Educ. of Cairo School Dist. No. 1, 147 F.3d 535, 543 n.19 (7th Cir. 1998) ("The district court correctly concluded that

a reasonable jury could not infer illegal discrimination merely because [the plaintiff] is black and some of the decisionmakers and his replacement are white"). But the main problem with Plaintiffs' cited evidence is that none of it tends to account for or impugn the reasons proffered for the decision to keep them on the runoff team instead of transferring them, i.e., that Plaintiffs and the other assistant underwriters on the runoff team had greater and/or unique experience and abilities that rendered them too valuable to the runoff team to be moved. It may be that ordinarily it is employees with greater experience and a wider range of abilities that are afforded advantageous training and transfer opportunities. So a decision by Vesta to extend such benefits to employees because they have lesser experience than Plaintiffs, who by the denial were subjected to an increased risk of being laid off, may be unfair in a real sense. However, deciding whether an employment decision was prudent or fair is not the province of the federal courts, which are concerned only with whether the decision was motivated by unlawful discriminatory animus. See Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999). See also Coutu v. Martin County Bd. of County Com'rs, 47 F.3d 1068, 1074 (11th Cir. 1995) ("Unfair treatment, absent discrimination based on race, sex, or national origin, is not an unlawful employment practice under Title VII"). Likewise, to the extent that Plaintiffs may have been misled by assurances that they would be transferred to other positions in an attempt to retain them because they were needed to complete the runoff work, even assuming such is a legal wrong, it is clearly not one that finds a remedy in federal anti-discrimination law. Nor would evidence that such occurred be indicative of discriminatory intent. Indeed, if anything, such tends to corroborate the truth of Vesta's assertion that Plaintiffs

were simply too valuable to the runoff work to be transferred.

The fact that all of the assistant underwriters who were afforded advantageous transfers to underwriter positions in personal lines were white while most of the assistant underwriters assigned to the runoff team were African-American is, if unexplained, quite probative when one is attempting to raise an inference at the prima facie stage that such assignments were racially discriminatory. However, Defendants have offered a race-neutral explanation for those personnel moves, and Plaintiffs now have a different task:  to show affirmatively that, in spite of such explanation, one could still reasonably find that it is more likely that race was a motivating factor for failing to transfer them. Of course, the racial composition of the group that was trained and transferred and of the group that was not is also relevant when attempting to cast doubt on the offered reasons.  See Walker v. Mortham, 158 F.3d 1177, 1184 n.12 (11th Cir. 1998) (evidence presented to establish a prima facie case may also be relevant to show pretext). However, Plaintiffs recitation of the race of employees placed in various positions and what happened to them does not answer Vesta's claim that those relatively few employment decisions were based on reasons other than race.

Put simply, Plaintiffs' evidence fails to show that any of the employee assignments or that anything Vesta did is at all inconsistent with the reasons it offers.  Grayson acknowledges that Crouch told her at about the time of the June 1999 moves that the employees assigned to the runoff team were selected based upon their expertise in certain areas, with hers being the Texas accounts.  Thus, Vesta appears to have consistently maintained the reasons it now offers were the basis for the employment decisions.   Plaintiffs do not dispute that Vesta's stated

race-neutral reasons regarding the need for their greater experience on the runoff team have a firm basis in fact. Beginning with their complaint, Plaintiffs have consistently asserted that all of the white employees who were transferred to personal lines had less experience than they did. Moreover, Alexander testified that she was the one underwriter assistant who had knowledge of, and could answer questions about, every type of commercial lines policy that was written by both Vesta and Shelby. Grayson similarly recognized that she was the only underwriter assistant left who had knowledge and experience working on the Texas commercial lines. Moreover, Plaintiffs do not dispute that their skills and experience would be invaluable to perform the work that needed to be done by the runoff team, as Vesta claims. In fact, Alexander admitted that she felt that her experience with both Shelby and Vesta commercial lines "had something to do with" Vesta's decision to keep her on the runoff team, while Grayson likewise acknowledged that her work on the lines in Texas and her established relationships with the agents servicing those accounts made her the "better person" for a runoff team job than some of the less experienced underwriter assistants who were actually transferred. Thus, each Plaintiff acknowledged that, from a pure business standpoint, it was sensible for Vesta to keep her on the runoff team rather than removing her to work in personal lines. Based upon the foregoing, the Court concludes that Vesta has presented substantial evidence indicating that it declined to train and transfer Plaintiffs for legitimate, non-discriminatory reasons and that Plaintiffs have failed to offer sufficient evidence to allow a finding that such reasons were merely a pretext. Accordingly, Vesta's motion for summary judgment is due to be granted with respect to the Plaintiffs' Title VII and Section 1981 claims based upon the June 1999

transfers.

### 2. The Termination Claims

Plaintiffs also challenge as racially discriminatory Vesta's decision to lay them off without offering them transfer to another position. Because their terminations admittedly resulted from the complete elimination of their positions in a legitimate RIF, each Plaintiff may establish a prima facie case of discrimination if she is able to "(1) show that he belongs to the statutorily protected age group (40-70); (2) show that he was discharged or demoted; (3) demonstrate that he was qualified to assume another position at the time of his discharge or demotion,[16] and (4) produce evidence, circumstantial or direct, from which a fact finder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." Coker v. Amoco Oil Co., 709 F.2d 1433, 1438 (11th Cir. 1983) (footnote added), superseded by statute in part on other grounds as stated in Wilson v.

_____

[16]The Court notes that there are many Eleventh Circuit opinions reciting that a plaintiff may establish the third element of prima facie case in a RIF context by showing either that he is qualified for his current position or another position that was available at the time of the plaintiff's termination. See, e.g., Williams v. Vitro Services Corp., 186 F.3d 1352, 1354 (11th Cir. 1999); Standard, 161 F.3d at 1331; Watkins v. Sverdrup Technology, Inc., 153 F.3d 1308, 1314 (11th Cir. 1998); Benson v. Tocco, Inc., 113 F.3d 1203, 1208 (11th Cir.1997). However, it is clear that only where a plaintiff's job duties are consolidated or reassigned to other employees that he may establish this prima facie element by showing qualification for his current position. See Williams, supra. But where, as here, "a particular job position is entirely eliminated for nondiscriminatory reasons, for plaintiff to prevail against his employer he must show that he was qualified for another available job with that employer; qualification for his current position is not enough." Earley v. Champion Intern. Corp., 907 F.2d 1077, 1082-83 (11th Cir. 1990).

General Motors Corp., 888 F.2d 779 (11th Cir. 1989). "To satisfy this final requirement, plaintiff must present evidence from which a fact finder might reasonably conclude either that the defendant consciously refused to consider retaining or relocating a plaintiff because of his age or that defendant regarded age as a negative factor in such consideration." Id.

Defendants attack Plaintiffs' ability to meet the third element above by pointing to evidence indicating that at the time of their respective terminations, May 26, 2000 for Grayson and August 25, 2000 for Alexander, there were no positions available for them in personal lines. Plaintiffs respond by arguing that there were several positions available for which they were allegedly qualified. First, they point to the opening in personal lines for an underwriter that became available when Carrie Davis resigned in January 2000. However, the fact that this opening existed several months before either Plaintiff was terminated is not sufficient to show that a position was available at the time of their termination for purposes of establishing a prima facie case on their RIF termination claims. See Early v. Champion Intern. Corp., 907 F.2d 1077, 1083 & n.4 (11th Cir. 1990) (holding that the plaintiffs failed to meet this element where the evidence showed that the positions cited "were open either well before the time of plaintiffs' termination or several months after their termination").

Plaintiffs also cite to the claims positions that Vesta sought to fill through the newspaper advertisements in late April 2000. Vesta concedes that following the running of these ads it hired eight individuals, three of whom were not African-American, to fill four types of claims positions: (1) claims supervisor; (2) claims examiner; (3) casualty adjuster; and (4) inside property adjuster. However, even

assuming that the three claims jobs filled by non-African Americans were available after Plaintiffs were notified on May 10, 2000 of their impending terminations and before they were laid off, there is no evidence suggesting that either Plaintiff had applied for or expressed interest in these positions unrelated to their prior jobs, that either had ever worked in a claims department, or that either was otherwise qualified for them. Indeed, Plaintiffs' argument is merely that they could have been trained for these positions, which would appear to be an implicit acknowledgment that they were not qualified without such additional training. As stated previously, federal anti-discrimination law does not impose an obligation on an employer undergoing a reduction in force to transfer its employees to other departments as a matter of course. Jameson, supra. Nor was Vesta required to fire white employees who were working in personal lines at the time of Plaintiffs' respective terminations in order to make room for Plaintiffs. The Court concludes that the Plaintiffs have failed to make out a prima facie case on their Title VII and Section 1981 claims based upon the fact that they were laid off without being offered a transfer. Accordingly, Defendants' motion for summary judgment is due to be granted insofar as it pertains to such claims.

## B. The Age Discrimination Claims

In their complaint, Plaintiffs bring claims of age discrimination under the ADEA based upon the same employment actions underlying their Title VII and Section 1981 race discrimination claims. The ADEA prohibits discrimination on the basis of age "against any individual with respect to his compensation, terms, conditions, or privileges of employment." 29 U.S.C. § 623(a)(1). Defendants' motion for summary judgment does not argue that Plaintiffs' ADEA claims are due

to be dismissed. "But so long as the party against whom judgment will be entered is given sufficient advance notice and has been afforded an adequate opportunity to demonstrate why summary judgment should not be granted, then granting summary judgment sua sponte is entirely appropriate." <u>Burton v. City of Belle Glade</u>, 178 F.3d 1175, 1204 (11th Cir. 1999).

The burden-shifting framework of <u>McDonnell Douglas</u> and <u>Burdine</u> that applies to Title VII cases where a plaintiff seeks to prove race discrimination using circumstantial evidence likewise applies to ADEA age discrimination claims involving such evidence. See <u>Mitchell v. Worldwide Underwriters Ins. Co.</u>, 967 F.2d 565, 566 (11th Cir. 1992). In this case, the Court has concluded that Plaintiffs have failed to come forward with sufficient evidence to cast doubt on the legitimate justifications offered by Defendants for keeping Plaintiffs on the runoff team instead of transferring them in June 1999. The Court concludes that the failure to impugn these offered reasons, in combination with each Plaintiffs' acknowledgment that she never heard anyone at Vesta make any age-related comments, is sufficient to indicate that there is no genuine issue of material fact and that Defendants are also entitled to judgment as a matter of law on Plaintiffs' ADEA claims relating to such transfers. In addition, the same reasoning underlying the Court's conclusion that Plaintiffs failed to make out a prima facie case on their race claims relating to their termination also applies to their corresponding ADEA claims. Thus, summary judgment appears warranted on those claims as well. However, under Fed. R. Civ. P. 56(c), a party must be given ten days notice before summary judgment may be entered against it. Accordingly, Plaintiffs will be given such time to present evidence showing that there exists a genuine issue of fact on their ADEA

claims or that Defendants are not entitled to judgment as a matter of law on such claims.

## C. The FLSA Claims

Plaintiffs contend that Defendants are liable under the FLSA for failing to pay them for overtime worked. The FLSA requires employers to pay additional compensation for overtime work, "at a rate not less than one and one-half times the regular rate" of pay for any time spent working in excess of forty hours per week. 29 U.S.C. § 207. Snapp v. Unlimited Concepts, Inc., 208 F.3d 928, 930 (11th Cir. 2000). In their motion for summary judgment, Defendants urge this Court to enter an order setting a maximum limit upon the Plaintiffs' recovery on their FLSA claims based upon the applicable statute of limitations and the answers Plaintiffs supplied at their respective depositions regarding how much overtime they can recall that they worked. The Court concludes, however, that Defendants' motion is due to be denied on this ground. To the extent that Plaintiffs' trial testimony might eventually contradict their recollections expressed in their depositions, Defendants may attempt to bring out such inconsistencies. However, Plaintiffs' deposition testimony cited by Plaintiffs does not establish that the amount of overtime they worked is truly without any substantial controversy. The Court will not now impose a limit upon Plaintiffs' potential recovery on their FLSA claims based upon what may have been imperfect memories upon the part of Plaintiffs at their depositions and the gymnastic pay calculations offered by Defendants.

## D. The Fraud Claims

Finally, in addition to their claims that they are entitled to unpaid overtime compensation under the FLSA, Plaintiffs bring related claims alleging that

Defendants are liable for fraud under Alabama law based upon Defendants' alleged misrepresentations to Plaintiffs that they were exempt from the overtime requirements of the FLSA. Defendants argue, however, that the FLSA preempts these claims because Plaintiffs are merely attempting to recast what are clearly FLSA overtime claims in hopes that they might recover damages for mental anguish and punitive damages that would otherwise be available under the FLSA. The Court agrees. See <u>Petras v. Johnson</u>, 1993 WL 228014 (S.D. N.Y. 1993). See also <u>Tombrello v. USX Corp.</u>, 763 F.Supp. 541, 544 (N.D. Ala. 1991). Accordingly, summary judgment will be granted on these claims.

## IV. CONCLUSION

Based on the foregoing, the Court concludes that Defendants' motion for summary judgment is due to be GRANTED IN PART AND DENIED IN PART. It is due to be granted to the extent that it seeks the dismissal of Plaintiffs' race discrimination claims brought under Title VII and Section 1981 and their fraud claims, as the Court finds that there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law on these claims. In addition, although Defendants have not moved for summary judgment on Plaintiffs' ADEA claims, the Court has determined <u>sua sponte</u> that the evidence demonstrates that there is no genuine issue of material fact and that Defendants are entitled to judgment as a matter of law on those claims as well. However, Plaintiffs will be afforded ten days from the entry of this order to present evidence and argument in support of their ADEA claims before they are dismissed. Defendants' motion is due to be denied to the extent it seeks an order placing a cap on the amount Plaintiffs might recover on their FLSA claims. Finally, the Court determines as a

matter of law that the FLSA preempts Plaintiffs' fraud claims as presented in the instant case.

IT IS SO ORDERED, this _18th_ day of June, 2001.

_____
H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE